IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CAROL A. GNEWUCH, | ) | |
| | ) | |
| Plaintiff, | ) | 4:10CV3165 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | MEMORANDUM OPINION |
| Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court for review of the
decision of defendant Commissioner of the Social Security
Administration ("SSA") denying Social Security Disability
Insurance ("SSD") and Supplemental Security Income ("SSI")
benefits to plaintiff Carol A. Gnewuch ("Ms. Gnewuch") pursuant
to 42 U.S.C. §§ 405(g) and 1383(c).  Upon review, the Court finds
the SSA's decision is not supported by substantial evidence and
should be reversed and the matter remanded for award of Ms.
Gnewuch's SSI and SSD benefits.

## I.  BACKGROUND AND PROCEDURAL HISTORY

Ms. Gnewuch was born in November 1948 (Tr. 22).  She
graduated from high school and is a licensed practical nurse
(Tr. 22-23).  Her most recent job, which she held for ten years,
was as a donor services specialist at the American Red Cross (Tr.
120).  Ms. Gnewuch alleges she has been disabled since January
31, 2007, when she hurt her back sweeping snow (Tr. 23).  She

alleges two major impairments, fibromyalgia and degeneration of the spine (Tr. 119).

Ms. Gnewuch saw John C. Wilcox, M.D., her primary care provider, on January 9, 2006, due to pain in the neck and shoulder (Tr. 219). She had been "getting physical therapy without much relief" (Tr. 219). That same day, Ms. Gnewuch saw Mike K. Perry, CRNA, PhD, DAAPM, at the Pain Clinic (Tr. 283). Dr. Perry noted that Ms. Gnewuch had been "diagnosed with fibromyalgia since 1991 and she has had occipital neuralgia symptoms since September of 2005. She has been going to physical therapy . . . and she also does massage therapy. States that between the treatments they last for a day or two for which she feels fairly decent and then she has a recurrence of symptoms." (Tr. 283). Dr. Perry performed a "trigger point" and a "greater occipital nerve block" for treatment of occipital neuralgia and fibromyalgia (Tr. 283-84).

On February 6, 2006, Dr. Wilcox noted that Ms. Gnewuch "has fibromyalgia and is still experiencing constant pain" (Tr. 225). Ms. Gnewuch saw Dr. Perry on seven occasions between February 6, 2006, and May 15, 2006, with similar complaints, diagnoses, and treatments as those of January 6, 2006 (Tr. 272-74, 276, 279-80, 282). On June 30, 2006, Dr. Wilcox noted that her "fibromyalgia was acting up," with "increasing pain" (Tr. 216). Ms. Gnewuch saw Dr. Perry on six occasions between July

-2-

17, 2006, and October 16, 2006, with similar complaints, diagnoses, and treatment as the previous visits (Tr. 211-13, 259-61).

On December 4, 2006, Dr. Perry wrote, "As far as her fibromyalgia, I informed her that she will continuously have these trigger point areas probably the rest of her life and it is a matter of how often to treat and the benefits she gains from them" (Tr. 253). Ms. Gnewuch saw Dr. Perry on January 15, 2007 (Tr. 251), February 5, 2007 (Tr. 231), and February 19, 2007 (Tr. 249), with similar complaints, diagnoses, and treatment.

On February 28, 2007, Kurt McCallum, P.T., of Grand Island Physical Therapy noted that Ms. Gnewuch "is extremely tender to palpation . . . . Active range of motion is extremely guarded due to acute lumbar disc syndrome" (Tr. 304). Ms. Gnewuch had physical therapy treatment thirteen times in March 2007, eleven times in April 2007, and twelve times in May 2007 (Tr. 298-303).

Ms. Gnewuch saw David S. Diamant, M.D. on March 19, 2007, for an epidural steroid injection in a disc in her back (Tr. 209). Dr. Diamant noted that Ms. Gnewuch had a history of "chronic low back pain" but that after the snow-sweeping injury, the "pain intensified and it began referring into both lower limbs, as well" (Tr. 207). Physical therapy and chiropractic treatment "improve her symptoms to about 50 percent," but "she is

-3-

still far worse than her previous baseline" (Tr. 207). Dr. Diamant noted that she had "constant low lumbar pain with referral into the buttock and posterior thigh" (Tr. 207). An MRI of the spine from February 13, 2007, showed "loss of height and hydration of the L4-5 disc with a bulge as well as loss of hydration of L1-2, L3-4, and L5-S1" (Tr. 207). Dr. Diamant noted that the "pain intensity is variable at best, 3/10; at worst 8/10" (Tr. 207). On March 26, 2007, a nurse noted that Ms. Gnewuch's leg pain "is almost gone" but that Ms. Gnewuch "[s]till has the [lower back pain]" (Tr. 206). The nurse sent a note to Ms. Gnewuch's employer calling for "no flexion" and a ten-pound weight limit (Tr. 206).

On April 10, 2007, Dr. Diamant noted that while Ms. Gnewuch's "leg symptoms have resolved," "she continues to complain of back pain" (Tr. 205). He explained to Ms. Gnewuch that "there is nothing likely that I can do that will probably lead to significant symptom relief" and that her pain is "likely discogenic" (Tr. 205). Dr. Diamant did "not think she would be a good candidate to consider further workup for discogenic pain and interbody fusion in light of her fibromyalgia history" (Tr. 205). Dr. Diamant noted that he did "think she is able to work provided that they will allow her to sit/stand as tolerated" (Tr. 205).

On April 9, 2007, Mr. McCallum wrote, "I would like [Ms. Gnewuch] to perform no more than 45 minutes to an hour of

-4-

driving without getting out and performing a McKenzie exercise"
(Tr. 301).  On April 20, 2007, Mr. McCallum wrote that Ms.
Gnewuch stated "the driving significantly aggravated her symptoms
up in to the 7-8 region" (Tr. 300).

On April 23, 2007, Dr. Wilcox noted that the March 2007
epidural had helped Ms. Gnewuch's leg symptoms but that the back
pains continued (Tr. 210).  Dr. Wilcox noted, "She is trying to
get back to work at the blood mobile, but some of the
restrictions that Dr. Diamant recommended, such as sitting and
standing whenever she needs to, may not be available for her
because of the work load" (Tr. 210).

On May 4, 2007, Mr. McCallum noted that Ms. Gnewuch
"was instructed at this time that she has been let go from her
job duties at the American Red Cross.  The American Red Cross
feels that they cannot accommodate the current restrictions that
she has been placed on due to her lumbar back and lower extremity
symptoms.  [She] is very disappointed about being fired . . . ."
(Tr. 299).  On May 17, 2007, Mr. McCallum noted that Ms. Gnewuch
"has not returned to work after [being] fired in the first week
of May by the American Red Cross.  She states that she [will]
possibly be trying to look for employment, but is very
discouraged due to the fact that she is not able to perform many
work activities without significant increase in symptoms in the
right and left lower extremity.  [She] continues also to have

-5-

right and left low back pain with symptoms greater on the left than right. She would like to advance her exercises as much as possible to further increase her endurance and allow her to gain strength for possible job situation" (Tr. 298).

On June 18, 2007, Dr. Diamant noted that Ms. Gnewuch has chronic low back pain, which was bothered by exercises in physical therapy (Tr. 333). Dr. Diamant thought that Ms. Gnewuch "is certainly not a good fusion candidate based on her history of fibromyalgia" (Tr. 333). He did not think she would be a good candidate for "provocation discography" (Tr. 333). Also, if "the pain were coming from the L4-5 disc, that might be too degenerative to even consider IDET" (Tr. 333).

Ms. Gnewuch saw Dr. R. L. Pomajzl, D.C., for chiropractic treatment on ninety-seven occasions between January 16, 2006, and September 18, 2007 (Tr. 186-97, 200-02). Ms. Gnewuch saw Dr. Wilcox on eleven other occasions for unrelated complaints, with little mention of back pain or fibromyalgia in the brief notes from January 9, 2006, to April 23, 2007 (Tr. 210, 214-19).

On July 11, 2007, Roderick Harley, M.D., a state agency reviewing physician, completed a Physical RFC Assessment of Ms. Gnewuch for her initial disability applications (Tr. 342). Dr. Harley listed Ms. Gnewuch's diagnoses as lumbar spondylosis and fibromyalgia (Tr. 342). Dr. Harley stated that Ms. Gnewuch's

diagnoses limited her to lifting no more than twenty pounds occasionally and ten pounds frequently, stand or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday (Tr. 342). On July 12, 2007, the SSA denied Ms. Gnewuch's initial SSD and SSI benefits claims.

On October 10, 2007, Jerry Reed, M.D., also a state agency reviewing physician, completed a second Physical RFC Assessment of Ms. Gnewuch for the reconsideration of her disability applications (Tr. 351). Dr. Reed noted that there were no new allegations since the last determination and that "the RFC of 7/12/07 is affirmed as written" (Tr. 351). On October 11, 2007, Ms. Gnewuch's claims were denied.

On November 13, 2007, Dr. Wilcox noted that Ms. Gnewuch "always has neck and shoulder pains from her fibromyalgia. She has seen her chiropractor at least once a week for the last 4 weeks, but no relief with the pain" (Tr. 392). On November 14, 2007, David A. Lindley, D.O. assessed Ms. Gnewuch with "chronic cephalgia of multifactorial etiology including possible chronic sinusitis, myofascial pain, occipital neuralgia, facetogenic pain, and rule out intracranial etiology status post head injury" and "fibromyalgia as previously diagnosed" (Tr. 364). Dr. Lindley performed a bilateral occipital nerve block and bilateral trigger point injections (Tr. 360).

-7-

On December 4, 2007, Dr. Lindley noted that after the injections at the previous visit, "[Ms. Gnewuch's] cephalgia resolved and was aborted for about five hours after the procedure" but that there was a "slow return of the symptoms over several days" (Tr. 358).  Dr. Lindley performed a bilateral occipital nerve block and bilateral trigger point injections (Tr. 357).  On January 8, 2008, Ms. Gnewuch saw Dr. Lindley with the complaint that the repeated injections from the last visit had aggravated her pain (Tr. 355).  Ms. Gnewuch "reports that her pain is 'all over' and is a burning and stiffness" (Tr. 355). Dr. Lindley did not want to continue the injections due to the increased pain (Tr. 356).

On January 31, 2008, Dr. Wilcox noted that Ms. Gnewuch "has been having some back pains recently and has seen Dr. Lindley. . . . She is able to do a little bit of walking for exercise but not much more than that" (Tr. 391).  On February 4, 2008, Dr. Lindley assessed Ms. Gnewuch as having chronic cervicalgia, fibromyalgia, and a significant stress and anxiety component of pain (Tr. 351).  Ms. Gnewuch saw Dr. Pomajzl for chiropractic treatment on seventy-eight occasions between September 25, 2007, and August 31, 2009 (Tr. 366-76, 450).  Ms. Gnewuch also saw Dr. Wilcox on eight other occasions for unrelated complaints, with little mention of back pain or

fibromyalgia in the brief notes, from March 3, 2008, to October 1, 2009 (Tr. 452-53, 378-79, 382, 385-86).

Ms. Gnewuch saw Linda Berry at the Mid-Plains Center for a psychiatric interview on January 23, 2008 (Tr. 418). Between February 6, 2008, and January 6, 2009, Ms. Gnewuch reported for medication checks on nine occasions with Ms. Berry, who noted Ms. Gnewuch's pain: "She brings a pillow in with her and she can be noted to be in pain as she sits down . . . .;" "She has difficulty with sleep at night in regard to her back pain . . . .;" "She sits erect in the chair and continues to display significant discomfort, which is in relation to her back problems" (Tr. 400, 403, 405-06, 408, 410, 412, 415-16).

Teri Garey, employment specialist at the Goodwill Industries of Greater Nebraska Employment Program, wrote on July 24, 2008, that Ms. Gnewuch has "applied for numerous jobs and has been turned down because of her limitations on lifting, not being able to sit long periods [of] time and not being able to stand long periods of time. . . . I have run out of ideas and suggestions for her and have discharged her from the Employment Program. . . . [E]mployers she has applied with . . . have stated they would not be able to hire her due to her physical health" (Tr. 155).

On June 19, 2009, Dr. Wilcox wrote in a Medical Source Statement that Ms. Gnewuch has "back pain, fibromyalgia,

migraines, chronic sinusitis, and respiratory allergies" (Tr. 422).  Dr. Wilcox wrote that Ms. Gnewuch could frequently lift/carry up to five pounds, occasionally lift/carry from six-ten pounds, and never lift/carry eleven-fifty pounds (Tr. 422). Dr. Wilcox wrote that Ms. Gnewuch could sit at one time for zero hours and could stand/walk at one time for zero hours (Tr. 423). During an entire eight-hour day, Ms. Gnewuch can sit for four hours and stand/walk for four hours (Tr. 423).  Dr Wilcox stated that this was because Ms. Gnewuch "can't sit for a full hour or stand/walk for a full hour" (Tr. 423).  Dr Wilcox stated that Ms. Gnewuch's complaints of pain were supported by "MRI - degen disc disease 2/07 also Dr. Diamant's findings/epidurals - Lincoln NE" (Tr. 423).  Dr. Wilcox found Ms. Gnewuch's complaints of pain to be credible (Tr. 423).  Dr. Wilcox stated that Ms. Gnewuch is taking four medications that cause drowsiness (Tr. 423).  Dr. Wilcox stated that Ms. Gnewuch is not a malingerer (Tr. 424).

Dr. Wilcox wrote that Ms. Gnewuch will need to "lie down or rest at unpredictable intervals during an 8-hour working day," six per eight hour shift for an average of one hour before returning to work (Tr. 424).  Dr. Wilcox stated that she is likely to be absent from work as a result of the impairments or treatment more than four times a month (Tr. 424).  Dr. Wilcox wrote that his prognosis for her was "chronic pain" (Tr. 425).

A hearing before an administrative law judge ("ALJ") took place on June 22, 2009, to review Ms. Gnewuch's SSD and SSI benefits claims.  Ms. Gnewuch testified that she was not able to work at her job at the American Red Cross after her snow sweeping accident on January 31, 2007, other than a brief effort to rejoin the job for just a few weeks (Tr. 23).  When she went back to her job, "My back hurt worse.  Anything I did seemed to bother it" (Tr. 23).  She stated that her fibromyalgia is "really bad across the shoulders and arms, so whenever I try to do anything I'll have horrible spasms there.  Sometimes it feels like someone's stabbing me.  Any time I use my arms a lot it does that" (Tr. 26).  Ms. Gnewuch said that this affects her daily activities because "I can't do a lot with my hands and arms because I have to -- well, as you see, my arms are resting on the table.  I have to have support for them.  If I'm sitting on a chair without support then it just pulls on the shoulders and they spasm the whole time" (Tr. 27).

The ALJ posed the following hypothetical to the vocational expert at the hearing:

> Please assume a hypothetical individual who is 60 years of age with some college course credit and past relevant work experience [of Ms. Gnewuch].  This individual has a combination of severe impairments and retains a residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently.  This individual

-11-

> retains an ability to stand, walk,
> and sit six hours each.  But this
> individual must change positions as
> needed. . . . This individual can
> occasionally balance, stoop, kneel,
> crouch, crawl and climb stairs and
> ramps.  This individual cannot
> climb ropes, ladders or scaffolds.
> This individual must avoid exposure
> to extreme cold, vibration,
> unprotected heights and dangerous
> moving machinery.  Given these
> limitations and these alone, could
> such an individual perform any of
> the claimant's past work?

(Tr. 34-45).  Based on the hypothetical, the vocational expert
stated, "I think the last job [at the American Red Cross,
presumably] was probably the mostly closely [sic] matching your
hypothetical" (Tr. 35).

       Ms. Gnewuch's attorney also asked a hypothetical
question of the vocational expert, based on "the medical source
statement completed by Dr. John Wilcox . . . Given those
limitations could she do any of the past work?" (Tr. 36).  The
vocational expert answered, "No" (Tr. 36).  Ms. Gnewuch's
attorney then asked, "Would there be any other work in the
national economy that she could do with those limitations?" (Tr.
36-37).  The vocational expert answered, "No" (Tr. 37).

       On September 2, 2009, the ALJ issued an opinion
upholding the denial of Ms. Gnewuch's SSD and SSI benefits
claims.  The ALJ evaluated Ms. Gnewuch's claim under the five-
step sequential process.  *See* 20 C.F.R. § 404.1520(a).  At step

-12-

one, the ALJ found that Ms. Gnewuch had not engaged in substantial gainful activity since January 31, 2007, the alleged onset date of her disability.  At step two, the ALJ found that Ms. Gnewuch's impairments, degenerative disc disease, allergic rhinitis, hypertension, and fibromyalgia, were severe.  At step three, the ALJ found that Ms. Gnewuch's impairments did not meet one of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app. 1.

Next, the ALJ determined that Ms. Gnewuch had an RFC "to lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk and sit 6 hours each in an 8-hour workday with an option to change positions as needed; occasional balancing, stooping, crouching, crawling, climbing ramps and stairs; cannot climb ladders, ropes and scaffolds; and avoid exposure to extreme cold, vibration, unprotected heights and dangerous moving machinery" (Tr. 15).  In making this determination, the ALJ found Ms. Gnewuch not credible "concerning the intensity, persistence, and limiting effects" of her symptoms (Tr. 16).  The ALJ found that Ms. Gnewuch's "impairments are not as limiting as she alleges" (Tr. 17).  The ALJ granted substantial weight to the expert opinion evidence offered by the state agency medical professional and to that of Dr. Diamant, because those opinions were "most consistent with the overall medical evidence of record" (*Id.*).  The ALJ discounted the RFC

offered by Dr. Wilcox, which the ALJ characterized as "contrary to his statements about treatment" and "an accommodation" (*Id*.).

At step four, the ALJ found that Ms. Gnewuch was able to perform her past relevant work as a donor services specialist. The ALJ found that Ms. Gnewuch's past relevant work "does not require the performance of work-related activities precluded by [her RFC]" (Tr. 17). Thus, the ALJ did not continue on to step five, and the ALJ determined that Ms. Gnewuch was not disabled and did not qualify for SSD benefits or SSI benefits.

After the date of the hearing, on October 22, 2009, Dr. Pomajzl wrote in a Medical Source Statement that Ms. Gnewuch has "cervical & lumbosacral subluxation complexes w/ assoc. disc degeneration" (Tr. 443). Dr. Pomajzl wrote that Ms. Gnewuch could frequently lift/carry up to ten pounds, occasionally lift/carry from 11-25 pounds, and never lift/carry 26-50 pounds (Tr. 443). Dr. Pomajzl wrote that Ms. Gnewuch could sit at one time for less than one hour and could stand/walk at one time for less than one hour (Tr. 444). During an entire eight-hour day, Ms. Gnewuch could sit for three hours and stand/walk for three hours because "symptom complexes of low back pain, low back spasms & leg pain are aggravated by prolonged sitting or walking" (Tr. 444). Dr Pomajzl stated that Ms. Gnewuch experiences pain sufficiently severe to prevent her maintaining attention and concentration 50+% of the time (Tr. 444). Dr Pomajzl stated that

-14-

Ms. Gnewuch's complaints of pain were supported by "positive chiropractic instrumentation readings, motion & static palpation finding and degenerative changes as seen on x-ray" (Tr. 444). Dr. Pomajzl found that Ms. Gnewuch's complaints of pain were credible and that Ms. Gnewuch is not a malingerer (Tr. 444-45).

Dr. Pomajzl wrote that Ms. Gnewuch will need to "lie down or rest at unpredictable intervals during an 8 hour working day" one to three times per eight-hour shift for an average of one to two hours before returning to work (Tr. 445). Dr. Pomajzl stated that Ms. Gnewuch is likely to be absent from work as a result of the impairments or treatment about four times a month (Tr. 445). He stated that her present condition will not change and may worsen (Tr. 445).

On July 2, 2010, the Appeals Council declined Ms. Gnewuch's request for review; thus, the ALJ's decision is now the final decision of the SSA. The Appeals Council considered additional evidence submitted by Ms. Gnewuch, including a letter from Ms. Gnewuch and the Medical Source Statement by Dr. Pomajzl. Ms. Gnewuch timely filed a complaint with the United States District Court for the District of Nebraska on August 23, 2010.

## II.  DISCUSSION

### A.   Standard of Review

When reviewing an ALJ's decision, the Court "must determine 'whether the ALJ's decision complies with the relevant

-15-

legal requirements and is supported by substantial evidence in the record as a whole." *Martise v. Astrue*, 641 F.3d 909, 920 (8th Cir. 2011) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)). "Substantial evidence" is:

> relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Substantial evidence on the record as a whole, however, requires a more scrutinizing analysis. In the review of an administrative decision, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight. Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* at 920-21 (quoting *Halverson*, 600 F.3d at 929). "'If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)). The Court may not reverse the ALJ's decision "merely because [the Court] would have come to a different conclusion. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir.2008)). The claimant "bears the burden of proving disability." *Id.* at 615.

-16-

"[T]he Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision." *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir., 2000) (citing 20 C.F.R. § 404.970(b)). "The newly submitted evidence thus becomes part of the 'administrative record,' even though the evidence was not originally included in the ALJ's record." *Cunningham*, 222 F.3d at 500 (citing *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir.1992)). In this case, the Appeals Council reviewed the additional evidence submitted but found no reason to review the ALJ's decision. "In these circumstances, we do not evaluate the Appeals Council's decision to deny review, but rather we determine whether the record as a whole, including the new evidence, supports the ALJ's determination." *Id.*

**B.   Substantial Evidence Does Not Exist Supporting the ALJ's Decision.**

**1.   Credibility of Ms. Gnewuch.**

An ALJ's credibility findings must be supported by substantial evidence. *Robinson v. Sullivan*, 956 F.2d 836, 839 (8th Cir. 1992). "In analyzing a claimant's subjective complaints of pain, an ALJ must examine: '(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; [and] (5)

-17-

functional restrictions.'"  *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (quoting *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).  If the ALJ gives a "good" reason for not crediting the claimant that is supported by the record, the Court will defer to the ALJ's judgment.  *Robinson*, 956 F.2d at 841.

Here, the ALJ found that "[Ms. Gnewuch's] medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that "[Ms. Gnewuch's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with [the ALJ's own RFC] assessment" (Tr 16).

The ALJ's credibility assessment is not supported by substantial evidence on the record as a whole.  In explaining his credibility assessment, the ALJ observed that Ms. Gnewuch "lives alone and performs a wide range of activities of daily living:" Ms. Gnewuch "cooks, does dishes, does laundry, cleans house but does not vacuum, drives for one hour before stopping, goes grocery shopping once a week, goes to church, reads, and watches television" (Tr. 17, 14).

However, the ALJ omitted relevant details concerning Ms. Gnewuch's activities.  For example, as to cooking, Ms. Gnewuch writes, "When I do cook, I make a large amt. so I can freeze it and warm up later.  It takes as much energy to do small meals as large.  I can't stand and cook every meal" (Tr. 131).

"[L]ifting pots and pans" makes the symptoms start (Tr. 133).  As to dishes: "dishes - 1 sink full is all my back can tolerate.  Too much pain" (Tr. 131).  As to laundry: "1 load is about all I can tolerate -- my back hurts.  I feel like I'll lean to pull clothes out of washer and dryer & never get up again . . . . 1 load kills my back" (Tr. 131).  "[D]oing laundry" makes the symptoms start (Tr. 133).

As to cleaning house but not vacuuming: "by the time I use my little Pledge grab it cloth on the kitchen floor my back hurts.  I do not vacuum -- makes my back hurt" (Tr. 131).  "[T]rying to do more in house" causes the symptoms to worsen (Tr. 133).  Ms. Gnewuch has "had to restrict or stop" "keeping my house clean" because of her symptoms (Tr. 134).

As to driving: "If I don't have to do it too often, I can drive for about 3 hrs if I stop and get out and walk every hour.  Otherwise, if I had to go every day, it couldn't be more than 1 hr.  If my back is really hurting -- I have to help my legs lift up to get my feet in the car" (Tr. 131).

The Eighth Circuit has found that the ability to perform daily activities similar to Ms. Gnewuch's is not inconsistent with the inability to perform full-time employment.  "[W]e have held, in the context of a fibromyalgia case, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability

-19-

to engage in substantial gainful activity." *Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003).

The next reason the ALJ cites for questioning Ms. Gnewuch's credibility is that Dr. Perry's treatments "[give] her quality of life that she did not have prior to treatment with Dr. Perry" and "physical therapy, messages [sic] and injections have reduced her pain symptoms" (Tr. 17). This synopsis is a misreading of the record as a whole. Ms. Gnewuch has sought relief from physical therapy, pain injections, chiropractic treatment, massages, and medication on literally hundreds of occasions, as cited above. [The ALJ notes that Ms. Gnewuch "was not interested in" suggested aquatic therapy (Tr. 16). The ALJ does not take note that Ms. Gnewuch "denied aqua therapy referral . . . on the basis of finances" (Tr. 353).] The evidence suggests that Ms. Gnewuch consistently returns for more treatment because the relief afforded, whatever the modality, is effective but fleeting. On the contrary, Ms. Gnewuch's complaints of pain are consistent with the objective medical evidence, as examinations by Dr. Diamant and Dr. Perry revealed Ms. Gnewuch suffered from disc degeneration and fibromyalgia.

Plaintiff's complaints are also consistent with opinion evidence in the record. Dr. Diamant stated, "She has fibromyalgia and has had back pain for years." (Tr. 205). In addition, "there is nothing likely that I can do that will

-20-

probably lead to significant symptom relief" from her "likely discogenic" pain (Tr. 205).  Dr. Pomajzl stated that he is treating Ms. Gnewuch for "cervical & lumbosacral subluxation complexes w/ assoc. disc degeneration.  Subjective complaints of headache & low back pain" (Tr. 443).  Dr. Pomajzl found Ms. Gnewuch's complaints of pain to be credible; he said that she was not a malingerer (Tr. 444, 445).  Dr. Wilcox found that Ms. Gnewuch "always has neck and shoulder pains from her fibromyalgia" (Tr. 392).

Based on the foregoing, the ALJ's credibility assessment is not supported by substantial evidence.  This Court finds that when viewing the evidence in the record as a whole, Ms. Gnewuch's statements concerning "the intensity, persistence and limiting effects of [her] symptoms" are credible.

### 2.  Opinion Testimony of Dr. Wilcox.

Ms. Gnewuch alleges that the ALJ erred in impermissibly discounting the opinion testimony of Dr. Wilcox, her primary physician.  Generally, "'a treating physician's opinion is entitled to substantial weight.'"  *Martise*, 641 F.3d at 925 (quoting *Brown v. Atrue*, 611 F.3d 941, 951-52 (8th Cir. 2010)).  However, an ALJ "may justifiably discount a treating physician's opinion when that opinion 'is inconsistent with the physician's clinical treatment notes.'"  *Id.* (quoting *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009)).  Here, the ALJ concluded, "I do

-21-

not give Dr. Wilcox's opinion much weight as it appears to be an accommodation to the patient" (Tr. 17).  The ALJ gave three reasons why Dr. Wilcox's opinion was to be discounted.

    **a.  The state agency medical opinion**.  The ALJ accorded substantial weight to the opinions of the state agency medical consultants, Dr. Harley and Dr. Reed, whose RFC assessment he adopted.  Dr. Harley and Dr. Reed did not examine Ms. Gnewuch; they merely performed a review of her file.  Generally, opinions of doctors who have not examined the claimant do not constitute substantial evidence.  *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).

    Dr. Harley stated that he arrived at his RFC limitations based on the fact that "Dr. Wilcox, her TS feels she is capable of returning to work at a job where she can move about or get up to stand or to change a position.  He does not insinuate that she cannot work at all" (Tr. 343).  However, the Court can find no evidence in the record that Dr. Wilcox made such a statement.

    Dr. Harley also writes that Dr. Wilcox's RFC is not supported by the evidence because "4/10/07 Dr. J. Wilcox, states she is able to work provided she can sit or stand as needed." (Tr. 348).  The Court can find no evidence in the record that Ms. Gnewuch saw Dr. Wilcox on April 10, 2007, or that Dr. Wilcox made such a statement on that date.  Ms. Gnewuch did see Dr. Diamant

on April 10, 2007, and Dr. Diamant did make a similar statement, as quoted above.  Ms. Gnewuch did see Dr. Wilcox on April 23, 2007, when Dr. Wilcox noted, "She is trying to get back to work at the blood mobile, but some of the restrictions that Dr. Diamant recommended, such as sitting and standing whenever she needs to, may not be available for her because of the work load" (Tr. 210).  Thus, the ALJ placed substantial weight on Dr. Harley, yet Dr. Harley seems to have based his decision to discount Dr. Wilcox's Medical Source Statement on a mistake:  Dr. Harley is attributing Dr. Diamant's statement to Dr. Wilcox.

With regard to the statement of April 10, 2007, properly attributed to Dr. Diamant, it should be noted that at the time of the statement, Ms. Gnewuch was, in fact, attempting to return to work.  However, this amounted to "an unsuccessful work attempt," in the words of the ALJ (Tr. 13).

**b.  RFC contrary to statements about treatment.**  The ALJ said that Dr. Wilcox's RFC "is contrary to his statements about treatment," citing "Exhibit 15F, pp. 1-16" (Tr. 17).  However, the pages cited are brief notes of visits to Dr. Wilcox from October 2007 to April 2009 for treatment of matters entirely separate from Ms. Gnewuch's disabilities (bowel problems, pelvic exam, flu, etc.) (Tr. 378-393).  Nevertheless, even in these brief notes, Dr. Wilcox states, "She always has neck and shoulder pains from her fibromyalgia.  She has been seeing her

-23-

chiropractor at least once a week for the last 4 weeks, but no relief with the pain" (Tr. 392); "She is afraid that the cholesterol medication will cause more muscle pain than she already has" (Tr. 391); and "[S]he is afraid that the virus combined with her fibromyalgia has caused even more pain than usual.  She had a massage today but the pains are already coming back" (Tr. 385).  While these particular notes primarily address health concerns other than the fibromyalgia and back pain, they are not "contrary to" Dr. Wilcox's RFC.

### c.  **Making progress and improving with treatment**.

The ALJ noted that "objective evidence indicates [Ms. Gnewuch] is making progress and improving with treatment," but the ALJ did not explain how Ms. Gnewuch's "progress" was inconsistent with her statements regarding the symptoms she experienced or her claim that she remains unable to perform full-time work despite any alleged improvement (Tr. 17).  In any event, the record is replete with objective evidence to the contrary.  Dr. Diamant stated that "[Ms. Gnewuch] has fibromyalgia and has had back pain for years. . . . [T]here is nothing likely that I can do that will probably lead to significant symptom relief" (Tr. 205).  Similarly, Dr. Perry wrote, "As far as her fibromyalgia, I informed her that she will continuously have these trigger point areas probably the rest of her life and it is a matter of how often to treat and the

benefits she gains from them" (Tr. 253).  Dr. Pomajzl wrote, "Her present condition will not change & may worsen" (Tr. 445).  This Court finds that the record describes chronic ailments with ups and downs and that ultimately, Ms. Gnewuch's prognosis is not improvement, but "chronic pain" (Tr. 425).

This Court finds that the ALJ erred in not giving the RFC of Dr. Wilcox, as Ms. Gnewuch's treating physician, great weight, as subsequently substantiated by the RFC of Dr. Pomajzl.

### 3.  Ms. Gnewuch's Donor Services Specialist Job.

As the ALJ points out, Dr. Diamant did write, "I do think she is able to work provided that they will allow her to sit/stand as tolerated" (Tr. 205).  This is consistent with Dr. Pomajzl's Medical Source Statement that "Ms. Gnewuch [needs] a job which permits shifting positions *at will* from sitting, standing, or walking" (Tr. 445).  Dr. Wilcox and Dr. Pomajzl both found that Ms. Gnewuch's complaints of pain were credible, and both set her limitations in their respective RFC's at a place where the vocational expert at the hearing testified that there would be no jobs available in the national economy.  Further, Ms. Gnewuch's Employment Specialist, Ms. Garey, found that Ms. Gnewuch's pain precluded job placement; the ALJ did not address Ms. Garey's opinion.

Based on the foregoing, this Court finds that the donor services specialist job is not consistent with Dr. Diamant's

requirement that Ms. Gnewuch be able to sit or stand as needed. In addition, the limitations set by the RFC's of Dr. Wilcox and Dr. Pomajzl do not allow for a job in the national economy, according to testimony by the vocational expert at Ms. Gnewuch's hearing.

### IV. CONCLUSION

The Commissioner's decision will be vacated, and this matter remanded for further findings consistent with this opinion.  A separate order will be entered in accordance with this memorandum opinion.

DATED this 14th day of September, 2011.

BY THE COURT:

/s/ Lyle E. Strom
_____
LYLE E. STROM, Senior Judge
United States District Court